# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARTIN LUTHER TEXADA | CIVIL ACTION NO. 6:07-0530 |
| VS. | SECTION P |
| BURL CAIN, WARDEN | JUDGE MELANÇON |
| | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2254 on March 8, 2007 by *pro se* petitioner Martin Luther Texada.  Petitioner is an inmate in the custody of the Louisiana Department of Public Safety and Corrections. He is incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  Petitioner attacks his 1998 convictions for two counts of attempted first degree murder, conspiracy to commit first degree murder, distribution of cocaine to a person under the age of 18, solicitation of a minor to distribute cocaine and five counts of committing acts in association with a street gang, entered in the Twenty-Seventh Judicial District Court for St. Landry Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the court.

For the following reasons, it is recommended that petitioner's remaining claims[1], that is, that there was insufficient evidence to support his convictions, that his sentence was excessive and that the state court improperly denied his motions for a mistrial (claims 1through 3 herein) be **DENIED** and **DISMISSED** with prejudice.

## STATEMENT OF THE CASE

The acts underlying the challenged convictions were summarized by the Louisiana Third Circuit Court of Appeal on direct appeal as follows:

> At the time of the incidents at issue, Martin Texada led an Opelousas street gang known as the "5/9 Bloods" or "Bossier Street Hustlers." Members wore red bandannas and used his residence as the gang's "hang out." On a daily basis, members sold illegal substances from his residence and stored a significant supply of cocaine in the trailer beside it. The two unrelated incidents below are at issue in this case.
>
> On October 25, 1996, Martin Texada arranged to sell sixty dollars worth of drugs to Sandra Guillory, who, unbeknownst to him, was working undercover with the Opelousas Police Department. Shortly thereafter, he gave fifteen-year-old gang member, Louis Daniel Freeman, three rocks of cocaine and told him to bring them to Guillory. After completing the transaction, Freeman returned to Martin Texada's residence and gave him the money he received from Guillory.
>
> On the night of June 12, 1997, in retaliation for disrespect shown to members of his gang, Martin Texada ordered gang members, Freeman and Lyle Raheem Jones, to go to the Greenwood area in search of certain individuals and to shoot whoever they saw because they might be the "certain individuals." He gave Freeman and Lyle Raheem Jones guns to carry out their mission and ordered gang member, Keith Jermaine Henry, to drive the car. Complying with his orders, Freeman and Lyle Raheem Jones fired at a group of people, which resulted in life-threatening gunshot wounds to Raven Richard and Liza Jackson.

---

[1]Petitioner's claims that he received ineffective assistance of trial counsel and that his attorney had a conflict of interest (claims 4 and 5 herein) have been previously dismissed as procedurally defaulted. [rec. docs. 24 and 33].

*State of Louisiana v. Martin Luther Texada*, 1999-1009, 756 So.2d 463, 467 (La. App. 3 Cir. 2/2/2000).

On November 18, 1998, petitioner was convicted of two counts of attempted first degree murder, one count of conspiracy to commit first degree murder, one count of distribution of cocaine to a minor, one count of soliciting a minor to distribute cocaine and five counts of committing acts in association with a street gang.  On January 29, 1999, sentences totaling 315 years were imposed as follows: Count 1 (attempted first degree murder) 50 years; Count 2 (attempted first degree murder) 50 years; Count 3 (conspiracy to commit first degree murder) 30 years; Count 4 (distribution of cocaine to a minor) 60 years; Count 5 (solicitation of a minor to distribute cocaine) 60 years; Count 6 (attempted first degree murder to promote the affairs of a criminal gang) 25 years;   Count 7 (attempted first degree murder to promote the affairs of a criminal gang) 25 years; Count 8 (conspiracy to commit first degree murder to promote the affairs of a criminal gang) 15 years; Count 9 (distribution of cocaine to a minor to promote the affairs of a criminal gang) 30 years; and Count 10 (solicitation of a minor to distribute cocaine to promote the affairs of a criminal gang) 30 years.  All counts were ordered to run consecutively, except for the 60 years imposed for Count 5 (solicitation of a minor to distribute cocaine) which was ordered to run concurrently with the 60 year sentence imposed for Count 4 (distribution of cocaine to a minor).  Petitioner's *pro se* Motion to Reconsider was denied on February 17, 1999.

Petitioner's convictions and sentences were affirmed by the Third Circuit Court of Appeal on February 2, 2000 in a thirty-three page detailed decision, which considered the entire record of the proceedings and the evidence submitted at trial. *State of Louisiana v. Martin Luther Texada*, 1999-1009 (La. App. 3 Cir. 2/2/2000), 756 So.2d 463; [doc. 20, pp. 2-35]. On direct appeal, petitioner raised the same three claims remaining herein: (1) insufficiency of evidence; (2) excessiveness of sentence; (3) and erroneous denials of motions for  mistrial.

With respect to petitioner's claim that there was insufficient evidence to support his convictions, the Third Circuit found that the State proved most of the elements of petitioner's crimes through the testimony of Louis Daniel Freeman, Keith Henry, and Kevin Pitre. *Texada*, 756 So.2d at 469. While Texada contended that the testimony of these three individuals must be viewed with extreme caution because they all benefitted from plea bargains in return for their testimony, the Third Circuit rejected that argument, finding that "[a]t trial, the State's witnesses made the jury aware of the plea bargain agreements." *Id.* Moreover, the court noted that "[d]efense counsel put on witnesses to attack the State's witnesses' credibility, [and] questioned them regarding prior inconsistent statements . . .", however, "the jury found the State's witnesses credible." *Id.* Therefore, "[s]ince it is the fact finder's role, not the appellate court's, to weigh the witnesses' credibility" the Third Circuit focused on whether the evidence presented satisfied the elements of the crimes. After reviewing all of the evidence presented, the court found that there was sufficient evidence to support all of Texada's convictions.

4

With respect to Texada's attempted first degree murder and conspiracy to commit first degree murder convictions, the Third Circuit found as follows:

> The evidence, viewed in a light favorable to the State, shows that Freeman and Lyle Raheem Jones were acting under Martin Texada's direction when they fired at a group of people, which resulted in two life-threatening injuries.  Although not present at the shooting's scene, Martin Texada directly counseled or procured another person to commit the crime; thus, as a principal, he is guilty of the offense.   "A person who aids and abets another in a crime, is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending upon the mental element proved at trial."  *State v. Texada*, 98-1647 (La. App. 3 Cir. 5/5/99); 734 So.2d 854 (involv[ing] crimes unrelated to the ones at issue in this case) *citing State v. Watson*, 397 So.2d 1337 (La. 1981), *cert. denied*, 454 U.S. 903, 102 S. Ct. 410, 70 L.Ed.2d 222 (1981).  The act of firing into a group of people has been found sufficient to prove specific intent to kill more than one person.  *State v. Butler*, 618 So.2d 572 (La. App. 2 Cir.), *writ denied*, 624 So.2d 1226 (La.1993) (defendant yelled gang slogans and fired five to eight shots at a crowd of people).  Thus, Freeman and Jones acted with the specific intent to kill.  Martin Texada also possessed this intent, as evidence existed that his instructions to Freeman and Jones included shooting certain people and whoever was in the area. The evidence also shows that he acted in combination with others for the specific purpose of committing first degree murder. Accordingly, Martin Texada's convictions for two counts of attempted first degree murder and conspiracy to commit first degree murder are affirmed.

*Id.* at 474.

These findings were supported primarily by the testimony of Freeman, Henry and Pitre.  Freeman's testimony was summarized by the Third Circuit as follows:

> Freeman classified the 5/9 Bloods as a gang and testified that Martin Texada led the gang "because he's the one mostly tells what to do." Freeman named the following members: Earl West, McDowell, Eddie Texada, Lyle Raheem Jones, Henry, Pitre, John Texada, and Melvin Lewis. At around 12:30 a.m. or 1:00 a.m. on the night of June 12, 1997, Henry,

Lyle Raheem Jones, Freeman, and Martin Texada were at Martin Texada's 1744 Bossier Street house. They were discussing a fight which had taken place at the park between "Earl and Big Mel" and Mark Richard. According to Freeman, Earl [West] and Big Mel [Melvin Lewis] were mad about what had happened, and Martin Texada was upset because one of the gang members had been disrespected. Freeman testified that he was "[j]ust talking about we got to go get them n-----," referring to Mark Richard, Joe Nathan, and Lorenzo. Lewis and West wanted to go do the shooting, but Martin Texada approached Freeman and Lyle Raheem Jones, wanting them to handle the matter. He then approached Henry and asked him to drive them. When Henry responded, "No, I ain't down with that," with a mean expression, Martin Texada told Henry that he was going to drive the car. He gave Freeman a .45 and Lyle Raheem Jones a .357. Freeman and Lyle Raheem Jones then got into Martin Texada's Geo Prism, driven by Henry, and went to the Greenwood area car wash. Freeman and Lyle Raheem Jones, armed with the guns, ran across the highway to a cement stump. Once they were spotted by one of the people sitting on the porch, the two opened fire. Freeman testified that he fired until his gun was empty and that Lyle Raheem Jones fired about six shots. According to Freeman, they shot these people because Martin Texada told them "to go handle that for him." As Freeman ran back towards the car, the people started firing back. When he met up with Henry and Lyle Raheem Jones, they drove back to Martin Texada's Bossier Street residence. Martin Texada asked Freeman if they had handled it, and Freeman replied affirmatively. He took the guns and when they heard on his scanner that the police chief was coming to Bossier Street, he told Freeman to run and hide in the back, which he did. At the time of the incident, Freeman was sixteen years old and was wearing . . . a red bandanna over his face.

On cross-examination, Freeman testified that Martin Texada did not instruct him to shoot victims Richard and Jackson. According to Freeman, it was dark and he could not see anyone, but Martin Texada had told them to shoot whoever was in the area. Freeman affirmed that he was at the crime scene to kill someone, but he later testified that he did not intend to kill anyone, just to shoot. On redirect, Freeman explained that he was told to look for Mark Richard, Nathan, and Lorenzo and "whoever would be out that might be them and to start letting out fire because that might be them." According to Freeman, he was just following his leader's orders.

. . . Opelousas Police Department Officer Jean Harrison testified that she spoke to Freeman after he was taken into custody for the shootings. Freeman asked for help and Officer Harrison did not make any promises, but said she would speak to the district attorney. Freeman told her of Martin Texada's involvement. The State played a videotape of Freeman's interrogation from July 13, 1997 for the jury during Officer Harrison's testimony.

During Freeman's testimony, he denied telling Christopher Jones, "I'm going to shoot Mark Richard and them because I'm not going to let them shoot me;" however, Christopher Jones testified that Freeman said he was going to protect himself and that two days before the shooting, Freeman requested a gun, but Freeman denied this.

*Id*. at 470-471.

The Third Circuit summarized Henry's testimony as follows:

Henry, the driver on the night of the shooting, affirmed his 5/9 Bloods association and that Martin Texada was the leader. According to Henry, if Martin Texada told gang members to do something, they complied without hesitation. Henry testified that a fight had taken place at the park between Lewis and Mark Richard and that a feud existed between Mark Richard and some of the gang members. Lewis and West wanted to "handle their business," but he told them he did not want them out there. Martin Texada said, "[t]hey have some people back here hanging back here on Bossier Street that's riding under my name. What y'all going to do when I'm not around. Y'all need to start handling y'all business." He appointed Freeman to "handle the business" and Lyle Raheem Jones said he would "do something to show him that." Despite Henry's initial resistance, he ordered him to drive the car. Henry drove Freeman and Lyle Raheem Jones to the Greenwood area because of Martin Texada's pressure. According to Henry, the .45 caliber gun belonged to Martin Texada and the .357 magnum belonged to West. Henry saw him give Lyle Raheem Jones a gun and tell him to handle his business. The State asked Henry if he heard Martin Texada's shooting order. Henry only remembered hearing Mark Richard's name. When the three returned to Bossier Street, Henry saw one of the guns given to Martin Texada.

On cross-examination, Henry affirmed that Martin Texada said to shoot Mark Richard, Courtney, and the people that "hung around" him, but Henry did not think this meant any girls. . . .

. . .

Also, Henry stated that prior to entering the plea agreement, he had told his attorney, Mr. Barstow, and others that Martin Texada had nothing to do with ordering him to shoot people and that West told him to "go along with this." On direct-examination, Henry testified that the statement he made to Mr. Barstow in 1997 was not made under oath and was a lie. On redirect-examination, Henry explained the circumstances surrounding the statement he gave to Mr. Barstow. He stated that Martin Texada brought him to Mr. Barstow and that Martin Texada had talked to him about an alibi. He stated that he gave Mr. Barstow the story which Martin Texada gave him.

*Id.* at 471.

The Third Circuit summarized Pitre's testimony as follows:

Pitre, a former 5/9 Bloods member, also testified that Martin Texada led the gang and that members took orders from him without hesitation. While in prison, Martin Texada told Pitre he "got tired of Lyle Jones and Danny Freeman riding on his dick with 5/9 Bloods" and "it was time for them to handle their business." According to Pitre, Martin Texada told Freeman and Lyle Raheem Jones, "[i]t was time for them to go out there and whatever, whoever was [sic] friends with Mark Richard go out there and shoot everybody [sic] was out there."

Pitre testified that he gave an unsworn recorded statement to Mr. Barstow right after the State incarcerated Martin Texada, but he did not tell the truth. On cross-examination, Pitre testified that Martin Texada gave him "a story" to tell Mr. Barstow on tape. Extensive questioning ensued regarding this statement and the circumstances surrounding it.

*Id.* at 472.

The Third Circuit further noted that all three, Freeman, Henry and Pitre, had

disclosed their plea agreements and immunity to the jury as follows:

Freeman testified that, in exchange for his guilty plea as an adult to two counts of attempted first degree murder and his agreement to testify

8

truthfully at any trial arising out of the case, the State agreed to recommend a sentence of not more than twenty-five years. The State also agreed not to prosecute Freeman for the October 25, 1996 distribution of cocaine charge. Freeman said that he understood that if he lied, the plea agreement would not be honored. *Id.* at 470

Henry, represented by an attorney, entered into a plea agreement with the State. Henry testified that, in exchange for his guilty plea to two counts of accessory after the fact to attempted murder and his truthful testimony, the State recommended that he receive concurrent sentences. On cross-examination, Henry affirmed that the State told him he would get concurrent five-year sentences. If he breached the agreement, the State would prosecute him as it saw fit and recommend a sentence it deemed appropriate. When defense counsel called Henry as a witness, it asked if the district attorney's office offered him immunity from prosecution. He responded, "Yes, sir, I think so."  *Id.* at 471.

When the State entered a plea agreement with Pitre, he was represented by counsel. The State agreed to reduce his aggravated rape charge to carnal knowledge of a juvenile, in exchange for his guilty plea to one count of carnal knowledge of a juvenile and his truthful testimony. The State also agreed to dismiss related charges of second degree kidnaping, possession of a firearm by a convicted felon, and an aggravated oral sexual battery. Further, the State agreed not to file an habitual offender bill against him. On cross-examination, defense counsel elicited testimony that as a part of his agreement with the State, he was to truthfully report what happened.

When recalled as a defense witness, Pitre affirmed that the district attorney's office would have "prepared a grant of immunity" if he testified.  *Id.* at 472.

The Third Circuit also noted that the  testimony of Freeman, Henry and Pitre differed from the testimony of defense witnesses Michael "Squirrel" McDowell, Mark Richard and Earl West, and the testimony of Texada.  McDowell testified that the day before the shooting, Jones shot a hole in Mark Richard's Cadillac using the same .357 pistol.  He further testified that he heard West tell Freeman and Jones to "handle their

own business." Moreover, he testified that Texada told West, Mark Richard and others to "leave the stuff alone" and that he, Texada, and Mark Richard had an agreement to just "be cool." Richard testified that he and Texada had talked about ironing out problems concerning other people. West, Texada's brother-in-law, testified that he did not give Freeman a gun and that the police had attempted to get him to testify against Texada, offering to help with his charges. Finally, at trial, Texada denied ordering a shooting on June 12, 1997. *Id*. at 473.

The Third Circuit also noted that Pitre and Henry both denied discussing their testimony while in jail. However, defense witness Jerome Thomas testified that he had overheard them discussing their trial testimony and "plotting" against Texada, while all three were in jail. Moreover, defense witness James Thomas testified that Pitre and Henry talked to each other while they were in jail, contradicting Pitre's testimony that he and Henry did not talk to each other in jail because he did not like Henry. *Id*. at 472-473.

With respect to Texada's convictions for distribution of cocaine to a person under the age of eighteen and soliciting a minor to distribute cocaine, the Third Circuit found that the "evidence [was] sufficient to prove that Martin Texada, twenty-two years old at the time, distributed cocaine to fifteen-year-old Freeman, seven years his junior, and that he procured Freeman to distribute cocaine to Guillory." *Id.* at 475. This finding was based on the testimony of Opelousas Police Department Officers Gallow and James, Captain Trahan and Freeman whose testimony was summarized by the Third Circuit as follows:

Officer Gallow testified that Guillory contacted him on October 25, 1996. She had agreed to do undercover drug work with the Opelousas Police Department. At the time of trial, Guillory's whereabouts were unknown. At Officer Gallow's request, Guillory agreed to contact Martin Texada. Officer Gallow, Officer John James, and Sergeant Dwayne Grimmett were present when Guillory called him, and Officer Gallow taped the conversation. Some statements contained on the tape and in the conversation transcript between Guillory and Martin Texada were deleted before jury presentation. The record contains a redacted audiotape copy, but not the transcript; however, the court reporter transcribed the tape in the record as it played for the jury. In the taped conversation, Guillory asked him if they could meet in forty-five minutes at the gas station by Soileau's Dinner Club and "meet [her] with about sixty." He said that he was going to send somebody there. Officer Gallow recognized Martin Texada's voice on the tape, a voice well-known to him. Officer Gallow gave Guillory marked money and a body microphone. Her purse and vehicle were checked before she departed.

Before leaving Guillory's house, arrangements were made for Captain Trahan to videotape the transaction. The officers followed Guillory to the north end of Opelousas near Soileau's Dinner Club. Officer Gallow monitored the body microphone transmission, but he could not see what was taking place because he was in a vehicle that moved continuously. On cross-examination, Officer Gallow said that Officer James sat in his vehicle's passenger side. Officer James testified that he observed the transaction, yet Officer Gallow moved continuously and could not see what took place. On cross-examination, Officer Gallow affirmed that Guillory received money for food for her child in exchange for her help.

Opelousas Police Department Officer Ronnie Trahan supervised the video surveillance unit, which had the capability of simultaneously recording the transmission from the transmitter. The State introduced the transaction's videotaped recording and played it for the jury while Officer Trahan narrated it. A brown Cadillac drove up and Freeman and McDowell exited. Freeman confirmed that Squirrel (McDowell) drove a "blue Ninety-eight." Officer Trahan also identified John Texada and Darwin Fontenot on the tape. The exchange between Guillory and Freeman occurred very fast, and he explained that this is normally done to avoid attention.

Opelousas Police Department Detective John James testified that he observed the narcotics buy between Guillory and Freeman on October 20,

11

1996. After the exchange, he took the evidence from Guillory, sealed it, and placed it in storage until it could be transferred to the Acadiana Crime Lab for analysis. The clerk marked the bag S-25. The trial court accepted Loret Rapp, an employee of Acadiana Crime Lab, as an expert in the field of forensic science with a specialty in forensic chemistry. Her tests on the four rocks contained in the bag, identified as S-25, revealed cocaine content.

Freeman testified that, on October 25, 1996, while Martin Texada was on the phone with Sandy [Guillory], she asked him for sixty dollars worth of illegal substance. Martin Texada asked Freeman if he had some, but Freeman told him he did not. While Freeman stood guard, he entered the trailer, used to hide his illegal substance, and cut down some rocks. He handed the rocks to Freeman and told him to bring them to Guillory. Squirrel (McDowell) drove Freeman to the store to meet Guillory. Guillory told Freeman to sit down in her car; once inside, she gave him sixty dollars and he gave her the rocks. Guillory told him if she needed some later she would beep Martin Texada and tell him. After the exchange, Freeman returned to Bossier Street and gave him the money. Freeman, who was fifteen at the time of the transaction, remarked that this was Martin Texada's "dope deal" and that he just went out and did it for him. At trial, the parties stipulated that Martin Texada was born on June 13, 1974, making him twenty-two during the October 25, 1996 drug transaction.

*Id.* at 474-475.

In confirming Texada's convictions for  promotion, furtherance or assistance of criminal gang activities, the Third Circuit found:

We are convinced that the . . . evidence shows that the 5/9 Bloods was a criminal street gang within the statute's meaning. The gang, comprised of more than three members, had as its primary activity the sale and possession of controlled substances. The attempted first degree murders and conspiracy to commit murder, ordered by Martin Texada as retaliation for disrespect to his gang, were committed in association with the gang with the intent to promote or further its affairs. Likewise, the drug transaction Freeman handled, at Martin Texada's behest, was to benefit the gang with the intent to promote, further, or assist in its affairs. Thus, this assignment of error is meritless.

*Id*. at 479.

The court relied upon the testimony of Officer Harrison, an expert in the field of investigation and monitoring of gang and juvenile gang activities, Sergeant Lathitia Trahan and Freeman, whose testimony was summarized by the court as follows:

> The trial court accepted Officer Harrison as an expert in the field of investigation and monitoring of gang and juvenile gang activities. She testified that the residence located at 1744 Bossier Street was Martin Texada's and that she targeted him for investigation from 1995 to 1997. The State showed Officer Harrison a series of photographs, taken by her, depicting gang-related graffiti. According to Officer Harrison, S-5-A was a picture of gang-related graffiti on the A & B Quick Stop, located about two blocks away from Martin Texada's residence. The markings "5/9" and "Blood" were on the photograph, as well as "B.S. Hustler," which according to Officer Harrison, means Bossier Street Hustler, an alternate name for the 5/9 Bloods gang. The photograph identified as S-5-B depicted graffiti in the same location. S-5-C was a photograph of graffiti written on a cement slab at the dead end of Bossier Street, several feet away from Martin Texada's house. The graffiti said "5/9," "No Crips," and "BSH." Across the street from his residence was a sign spray painted with "5/9", which was depicted in the photograph labeled S-5-D. S-5-E was a picture of the bleachers at South City Park (Bossier Street is on the north side of town near North City Park). Officer Harrison described the picture's contents:
>
> Q. Where is the 5-where are the markings?
> A. 5/9.
> Q. Okay. And was there also reference to other gangs?
> A. Yes, sir.
> Q. We're big boys and girls here. Just tell us what it says.
> A. Okay. Right here it says uh-I think it says "A[-] COPS 5/9 Thug."
> Q. Okay.
> A. To the top it says "F[---]. . . ." Something is marked out right here but it also has "Crips."
>
> The last photograph, S-5-F, also taken at the bleachers at South City Park, contained the markings "5/9 Thug Life." The State showed Officer Harrison pictures of some of the people she observed at Martin Texada's residence. She identified them as McDowell, West, Freeman, Pitre, Henry, Lewis, and Tyrone Johnson. Lyle Raheem Jones, Fontenot, Randy Kennerson, and

13

Christopher Jones were also seen at the house. Officer Harrison kept his house under surveillance for about one and one-half days, during which time she saw known drug users entering and exiting. Martin Texada originally resided in the trailer, but he then moved to the house next door and Johnson began staying in the trailer. Officer Harrison observed a considerable amount of traffic between the trailer and the house. Officer Harrison believed that a gang operated out of leader Martin Texada's residence. The 5/9 Bloods' color was red, and members wore red bandannas. A wooden paddle covered with a red cloth bandanna, bearing the words "Piru Blood," was recovered from gang member John Texada, Martin Texada's brother. Also taken from John Texada was a red and white baseball cap. The bill of the cap said "Bloods" and the back said "5/9." It appears the cap also bore the words "Bossier Street Hustlers" and the name "John."

According to Officer Harrison, Johnson was second in command, but when he left to serve time, McDowell, "Squirrel," took his place. On cross-examination, she testified that she learned this information from interviewing the organization's members.

The police obtained a search warrant for the trailer located at 1744 Bossier Street, and Officer Harrison participated in the search. The State showed Officer Harrison four bags of evidence, identified as S-17, recovered in the search. The first bag contained one large rock or slab (which appeared to Officer Harrison to be cocaine) and razor blades. The second bag contained one rock, and the third bag contained seven large slabs. The fourth bag contained "six cookies in each plastic bag." The police recovered a microwave from the residence, as well as over three hundred dollars found in a sofa pillow. They also seized a weapon and a scale.
. . .

Officer Harrison conducted a video surveillance of Martin Texada's residence on April 30, 1997 and May 1, 1997. Officer Harrison prepared a summary of the activity viewed on the videotape (S-19). She testified that it accurately reflected what she observed on those dates. Officer Harrison described the activity which she observed at Martin Texada's residence during her surveillance. This included strange vehicles driving up, making contact, and leaving immediately as well as people arriving on foot and bicycle, making contact, and leaving immediately. Officer Harrison stated that drug sales are normally conducted in a fast manner with minimal contact between the purchaser and seller. Items are easily passed from hand or mouth to hand, and these were the types of transactions observed on

Bossier Street. On cross-examination, Officer Harrison testified that she did not see any controlled dangerous substances and that these people could have been transferring almost anything. However, she also stated that she observed Bossier Street for two years and the activity during the surveillance was typical of drug transactions.

. . .

According to Officer Harrison, Martin Texada had no lawful, gainful employment, but he had several cars. She indicated that he had a late model green Mustang, registered in his mother's name, a 1980 model reddish-orange Grand Prix, an old Cadillac "at one time," a burgundy Ford Mustang, and a tan Geo Prism. Martin Texada explained that his mother owned the green Mustang, although he acknowledged owning the Geo Prism and the 1987 model Mustang, and he said that the Cadillac did not work in 1997. Officer Harrison confirmed that at one point Martin Texada ran a clothing store, but that this only lasted a week or so. According to Officer Trahan, Martin Texada co-owned or operated a store for three or four months. To Officer Harrison's knowledge, West, "Squirrel" McDowell, Freeman, Henry, Johnson, Lewis, Pitre, John Texada, Christopher Jones, Kennerson, Fontenot, and Lyle Raheem Jones did not have lawful, gainful employment, and they were seen continuously on the street in front of Martin Texada's residence, day and night, having frequent contact with strangers. As an expert in the field of gang investigation and activities, Officer Harrison affirmed her convictions that 1744 Bossier Street was the site of ongoing gang activity and drug trafficking.

Opelousas Police Department Sergeant Lathitia Trahan went to 1744 Bossier Street while on duty on April 2, 1997. Martin Texada granted Sergeant Trahan's request to enter the trailer, but he indicated that he no longer lived there. Sergeant Trahan conducted a search, and each piece of evidence seized was placed into a bag. The first bag contained one off-white rock substance found stuck in the trailer's wall. She found one partially smoked cigar, containing a vegetable like substance, on the speaker in the front room. On the floor near the trailer's front door, she found a syringe with a needle. The fourth bag contained nine off-white rocks with crumbs, five large pieces of off-white rock substances, and crumbs found in the trailer's ceiling insulation. The fifth bag contained off-white powder crumbs found on the sofa bed. A plastic Tylenol bottle and a piece of aluminum foil, containing off-white substances, were found on the kitchen cabinet's north side. On the bed in the kitchen, she found five off-white rocks. The eighth bag contained one clear plastic bag containing

four off-white rocks and crumbs and one small ziplock plastic bag, containing five off-white rocks that she found under the stove in the kitchen. The last bag contained off-white rock substances and crumbs that she found in the sofa pillow. Mr. Ardoin testified that seven of the nine bags contained crack cocaine and weighed a total of 39.5 grams, which, according to Mr. Ardoin, was enough to make two to four hundred rocks.

The State showed Freeman a photograph, identified as S-5(C) and previously introduced during Officer Harrison's testimony. Freeman testified that he, Martin Texada, and someone else spray-painted the sidewalk and that S-5(D), which showed the "5/9," the symbol for the gang, was painted by Martin Texada with red spray paint. The State asked him what he generally did on Bossier Street. He responded that he sold drugs for Martin Texada. Starting in 1995, Freeman "hung out" on Bossier Street just about every day, and he never knew Martin Texada to work. However, Martin Texada had four or five cars and carried about two to three thousand dollars. According to Freeman, the gang members and Martin Texada put the illegal substances, which they concealed inside its floors and walls, in the trailer on the side of his house to them. He further stated that the illegal substances he sold came from Martin Texada. An ounce of illegal substance would sell for about sixteen to seventeen hundred dollars, six to seven hundred of which Freeman would keep. Officer Harrison testified that Freeman said that Martin Texada paid him with tennis shoes; however, Freeman denied these payments. The State asked Freeman if Martin Texada got the other thousand dollars, and he replied, "he would get like what he had paid for it or what he wholesaled it to you for." According to Freeman, McDowell, Fontenot, Henry, "Big Mel," and Lyle Raheem Jones, everyone sold drugs out of Martin Texada's house, and this required membership in the organization.

State witness, Eddie Texada, Martin Texada's brother, denied ever having heard of the 5/9 Bloods or the Bossier Street Hustlers. The State asked him to show his tattoos to the jury. The tattoo on his neck had the letters "B," "S," and "H," which he contended stood for "Brothers Stay Hard."

Gang member, Pitre, testified that the 5/9 Bloods' activities were taking place at 1744 Bossier Street and that red bandannas were their symbol. The State asked him what was considered his territory while in the gang, to which he responded, behind the park on Nicole Lane and Martin's car wash. Pitre had a tattoo, referring to 5/9 Bloods, which he got while a member.

16

According to Pitre, the gang's purpose was to "make money, sell drugs," which he did, every day in 1994. He also witnessed Freeman, West, Johnson, McDowell, Fontenot, and Christopher Jones selling drugs on Bossier Street.

Henry, a 5/9 Bloods' gang associate, sold drugs in 1997 "for himself." The drugs would sometimes come from West and as Henry testified, he would sometimes sell drugs on Bossier Street.

State witness Johnson, Martin Texada's good friend, testified that he had heard of the 5/9 Bloods on television, but neither he nor Martin Texada were members. Although Johnson initially stated that he had not heard of the Bossier Street Hustlers, he later affirmed that "BSH" stands for "Bossier Street Hustlers." During questioning, the prosecutor referred to his letter, in which he acknowledged making the following statements: "What's up B.S.H.? ... I'm telling y'all before y'all know it I'll be right back in the hood (Bossier) where them 5/9 'G' at." Although certain comments in the letter were directed to Martin Texada, Johnson denied Martin Texada's 5/9 Bloods' membership. He explained that he probably wrote the letter for "about four or five different people." Defense witness, McDowell, testified that the police picked him up numerous times and threatened him with charges; however, if he would agree to place the blame on Martin Texada, they would release him.

*Id*. at 476-479.

   With respect to petitioner's claim that his sentence was excessive, the Third Circuit noted that consecutive sentences were mandatory for the gang related convictions, but that for the attempted murder, conspiracy and drug counts, under Louisiana Code of Criminal Procedure article 883, consecutive sentences were discretionary.  *Id*. at 481. The court found that Texada had "a history of criminal activity and obviously ha[d] no regard for human life . . . [given that a]s a result of his actions, two innocent victims suffered serious, life-threatening injuries . . . ."  *Id.*  Moreover, given that Texada "led the

17

gang and used his position of authority to influence others to engage in egregious criminal activity. . .", the court found that Texada's "actions show[ed] a gross disrespect for society and life." *Id*. at 481-482.  Thus, the court held that "a life sentence is not excessive in his case. Three hundred fifteen years is a very lengthy sentence; however, effectively, it is the same as a life sentence without the benefit of parole and is more than appropriate for the atrocities he has inflicted on others."  *Id*. at 482.

Petitioner also complained on appeal about four instances wherein he felt that a mistrial should have been granted: (1) following a remark about dogfighting from Officer Trahan; (2) after Freeman testified that Texada spray painted the gang's symbol on a sign and that drugs were sold from Texada's residence; (3) when, in response to a question asked by defense counsel, Assistant District Attorney Tromblay stated that he charged another member of the gang because, amongst other reasons, he had information that the gang member shot another victim at the direction of Texada; and (4) when the State used an exhibit displaying the gang's hierarchy with Texada's name at the top.  The Third Circuit rejected each petitioner's claims, as well as his claim directed at the cumulative effect of these alleged errors.

With respect to the dogfight reference, the court found that the testimony was not deliberately elicited, was unsolicited and non-responsive, and, therefore, not chargeable against the State.  Moreover, the court found that the trial court did not have a duty to admonish the jury absent a request by defense counsel. *Id*. at 482-483. Furthermore, the

18

court found that the failure to admonish the jury was harmless because of the "substantial evidence" of Texada's guilt. *Id*. at 483.

As for Freeman's testimony regarding the spray painting of gang symbols and the alleged sale of drugs from Texada's residence, the court found that these acts were not "other crimes evidence", but rather were elements of the crime of committing acts in association with a street gang, for which no prior notice was required under state law. *Id*. at 484.   More specifically, the court noted that the testimony regarding the sale of drugs was admissible to meet the definition  of "criminal street gang"contained in the statute, and that the evidence of spray painting was necessary to show the existence of the gang's identifying symbol, as well as Texada's association with the gang. *Id.*

The court additionally found that because the evidence at issue in this case was an integral part of the crime charged, the statute was not unconstitutional because it allowed "other crimes evidence" without prior notice in contravention of Louisiana state law (*State v. Prieur*, 277 So.2d 126 (La. 1973)). However, the court declined to address Texada's alternative "one line argument", that the statute was unconstitutional because it was overly broad and vague, because the issue was not sufficiently briefed as required by Rule 2-12.4 of the Uniform Rules of the Courts of Appeal.  *Id.* at 485.

With respect to the comments of ADA Tromblay, relying on prior state precedent, the court held that the State should not be penalized for testimony which the defense elicited, that the testimony was not elaborative and that the trial court admonished the jury

19

and therefore there was "no indication that the trial court abused its discretion in denying the mistrial motion." *Id.* at 486.

With respect to the exhibit displaying the gang hierarchy, the court found that at the time of the motion, both Officers Harrison and Trahan had testified that they had determined that Texada led the gang, and that a "considerable amount of testimony later established this fact.  Thus, the chart's display to the jury did not deprive him [Texada] of a fair trial." *Id.* at 487.  The court further found no abuse of discretion by the trial judge in denying the defense motion for a mistrial.  *Id.* at 488.

Finally, the court held that the cumulative effect of each alleged error in failing to grant a mistrial did not deprive Texada of a fair trial.  *Id.*

Petitioner's writ application was denied by the Louisiana Supreme Court on June 29, 2001 without comment.  *State of Louisiana ex rel. Martin Luther Texada v. State of Louisiana*, 2000-2751 (La. 6/29/2001), 794 So.2d 824.  [doc. 20-2, p. 26].  Petitioner did not seek further direct review in the United States Supreme Court.

Petitioner filed the instant petition for federal writ of *habeas corpus* on March 8, 2007. He argued five claims for relief: (1) insufficiency of evidence; (2) excessiveness of sentence; (3) erroneous denial of motions for a mistrial; (4) ineffective assistance of trial counsel; and (5) that his attorney had a conflict of interest.

On April 14, 2009, the undersigned recommended dismissal petitioner's  claims that he received ineffective assistance of trial counsel that his attorney had a conflict of

interest (claims 4 and 5 herein) as procedurally defaulted. [rec. doc. 24].   Judge Melancon adopted the undersigned's recommendation and accordingly, dismissed those claims on May 6, 2009. [rec. doc. 33]. Petitioner's appeal of that Judgment was dismissed on July 20, 2009. [rec. doc. 45].  The stay entered by this court pending disposition of petitioner's appeal was lifted on September 1, 2009. [rec. docs. 43 and 46].

The State has filed an Answer to the claims which remain pending before this Court. [rec. doc. 39].  Petitioner has filed a Reply. [rec. doc. 44].  This Report and Recommendation follows.

## LAW AND ANALYSIS

### *Timeliness of the Petition*

The State urges that this court find Texada's petition untimely filed. The undersigned has previously recommended dismissal of the petition as time-barred. [rec. doc. 2].  That recommendation was accepted by Judge Melancon, and the case was dismissed. [rec. docs. 3 and 5].  On application for a certificate of appealability (COA), the Fifth Circuit remanded the case to this court. [rec. doc. 18].

The Fifth Circuit held that it did not plainly appear from petitioner's pleadings and attached exhibits that he was not entitled to equitable tolling of AEDPA's one-year limitations period pursuant to 28 U.S.C. § 2244(d).  The court recognized that mere attorney error or neglect is not an "extraordinary circumstance" such that equitable tolling is justified, citing *Cousin v. Linsing*, 310 F.3d 843, 849 (5th Cir. 2002), but that where an

21

attorney had actively misled a petitioner into believing that a federal *habeas* petition had been filed on his behalf, equitable tolling was warranted.  The court relied on its decision in *United States v. Wynn*, 292 F.3d 266 (5th Cir. 2002) in that regard.  The Fifth Circuit went on to note that petitioner alleged that his counsel had begun to mislead him in 2001, "before his state *habeas* application had been filed or his federal limitations period had run. . ." [rec. doc. 18,  *per curiam* opinion, p. 2].

The evidence which petitioner attached to his pleadings in support of this allegation is a letter from his attorney, Richard A. Spears, dated October 7, 2006.  In this letter, Spears informed petitioner that the one-year limitation period had been "tolled" by the filing of state post-conviction proceedings, and that, therefore, "time is not running [on] your direct appeal habeas rights." [rec. doc. 4, p. 12].  In this assertion, Spears correctly, though incompletely, summarized the law.

Of course, state post-conviction proceedings, which are properly filed, toll the one-year limitation period.  In this case, however, petitioner's conviction became final on September 27, 2001.  Thus, petitioner had one year, or until September 27, 2002, to file for federal *habeas* relief in this Court.  He did not do so.  Furthermore, petitioner did not file for state post-conviction relief until July 15, 2003, almost 10 months after his one-year period for filing for federal habeas relief had expired.  Petitioner's counsel, Spears, apparently believed that filing for state habeas relief, even after the expiration of AEDPA's one-year limitation period, served to somehow "revive" his federal *habeas*

rights.  In this belief, Spears was wrong.  *See Villegas v.Johnson*, 184 F.3d 467, 472 (5th Cir. 1999) *citing Flanagan v. Johnson*, 154 F.3d 196, 199, n. 1 (5th Cir. 1998).

Thus, the undersigned believes that it is clear that Spears' error in believing that a state court petition for post-conviction relief, filed after the one-year limitation period had run, does not constitute the "extraordinary circumstance" needed for equitable tolling under *Wynn*.  Rather, Spears' error was one of law, and not so "extraordinary" so as to warrant equitable tolling.  *Cousin v. Lensing,* 310 F.3d 843, 848-849 (5th Cir. 2002).  This is not a case, like *Wynn*, where petitioner's attorney lied to petitioner.  Rather, this is a case where petitioner's attorney incorrectly advised petitioner on the controlling principles of law.  *See Lawrence v.  Florida*, 127 S.Ct. 1079, 1085 (2007) ("Attorney miscalculation is simply not sufficient to warrant equitable tolling particularly in the post-conviction context where prisoners have no constitutional right to counsel").

Nevertheless, the Court of Appeals apparently disagrees.  Therefore, a review on the merits is required.

***Standard of Review***

This *habeas* petition was filed on March 8, 2007; therefore the standard of review is set forth in 28 U.S.C. § 2254(d), as amended in 1996 by AEDPA.  *Knox v. Johnson,* 224 F.3d 470, 476 (5th Cir. 2000);  *Orman v. Cain,* 228 F.3d 616, 619 (5th Cir. 2000).[2]

---

[2]Before enactment of AEDPA, "a federal court entertaining a state prisoner's application for *habeas* relief . . . exercise[d] its independent judgment when deciding both questions of constitutional law and mixed constitutional questions (i.e., application of constitutional law to fact).  In other words, a federal *habeas* court owed no deference to a state court's resolution of such questions of law or mixed questions."  *Montoya ,* 226 F.3d at 403-04  *citing Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000) and 28 U.S.C. § 2254(d)

23

AEDPA substantially restricts the scope of federal review of state criminal court proceedings in the interests of federalism, comity, and finality of judgments.  *Montoya v. Johnson*, 226 F.3d 399, 403-04 (5th Cir. 2000) *citing Teague v. Lane,* 489 U.S. 288, 306, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and  *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000)[3] (noting that AEDPA "placed a new restriction on the power of federal courts to grant writs of *habeas corpus* to state prisoners").

Title 28 U.S.C. § 2254(d) as amended, provides as follows:

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

**(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the deferential scheme of § 2254(d), as amended, this court must give deference to a state court decision for "any claim that was adjudicated on the merits in State court proceedings" unless the decision was either "contrary to, or involved an

_____

(1994).

[3]Justice O'Connor delivered the opinion of the Court with respect to the standard of review, while Justice Stevens delivered the opinion of the court with respect to other aspects of the opinion which have no bearing on the issues herein.  Accordingly, the undersigned will refer to Justice Steven's opinion as a concurring opinion.

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"  28 U.S.C. § 2254(d)(1), or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

A *habeas* petitioner has the burden under AEDPA to prove that he is entitled to relief.  *Ormon*, 228 F.3d at 619 *citing Williams,* 120 S.Ct. at 1518, and *Engle v. Isaac*, 456 U.S. 107, 134-35, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).  Under § 2254(d), as amended, "[t]he federal courts no longer have a roving commission to discern and "correct" error in state court proceedings, but must exercise a more limited review . . . ."  *Grandison v. Corcoran*, 78 F.Supp.2d 499, 502 (D. Md. 2000).  Federal courts may not grant the writ merely on a finding of error by a state court or on a finding of mere disagreement with the state court.   *Montoya,* 226 F.3d at 404;  *Orman,* 228 F.3d at 619.

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a  set of materially indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) *citing Williams,* 120 S.Ct. at 1523;  *Montoya,* 226 F.3d at 403-04 *citing Williams*, 120 S.Ct. at 1523.  "The 'contrary to' requirement 'refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision.'"  *Dowthitt,* 230 F.3d at 740 *citing Williams*, 120 S.Ct. at 1523.

25

Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dowthitt,* 230 F.3d at 741 *citing Williams,* 120 S.Ct. at 1523.  The standard is one of objective reasonableness.  *Montoya,* 226 F.3d at 404 *citing Williams,* 120 S.Ct. at 1521-22.  A federal *habeas* court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly . . . [r]ather, that application must also be unreasonable." *Williams,* 120 S.Ct. at 1522.

Section 2254(d)(2) speaks to factual determinations made by the state courts. *Dowthitt,* 230 F.3d at 741.  Federal *habeas* courts presume such factual determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing evidence.  *Id.*; 28 U.S.C. § 2254(e)(1).  Thus, this court must defer to the state court's decision unless it was based on an unreasonable determination of the facts in light of the record of  the State court proceeding.  *Id. citing* 28 U.S.C. § 2254(d)(2); *Knox,* 224 F.3d at 476 *citing Chambers v. Johnson,* 218 F.3d 360, 363 (5th Cir. 2000).  *See also Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) ( "Unless rebutted by clear and convincing evidence, a state court's determination of a factual issue shall be presumed to be correct. The presumption [that a state *habeas* court's factual findings are correct] is particularly strong when the state habeas court and the trial court are one and the same.").

26

Petitioner's three remaining claims were adjudicated on the merits in the Louisiana state courts.  Accordingly, review of these claims is governed under the above standard.

## I.  Sufficiency of the Evidence

A criminal defendant has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense.  *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979).  Furthermore, under *Jackson*, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. Thus, when a defendant seeking federal *habeas* relief contends that the evidence is insufficient to support a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Gibson v. Collins*, 947 F.2d 780, 781 (5th Cir. 1991) *quoting Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis added).  Accordingly, federal *habeas* relief is appropriate only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *West v. Johnson,* 92 F.3d 1385, 1393 (5th Cir. 1996) *citing Jackson*, 443 U.S. at 322-26.

The *Jackson* standard is applied with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 323 n.16, 99 S.Ct. at 2792 n.16.  Thus, a federal court "gives great weight to the state court's determination." *Gibson*, 947 F.2d at 782, 786; *Porretto v. Stalder*, 834 F.2d 461, 467 (5th Cir. 1987). Accordingly, under the *Jackson* standard, a federal *habeas* court may find sufficient evidence to support a conviction "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson*, 947 F.2d at 783.  Either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction.  *Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990) *citing Jackson*, 443 U.S. at 319, 324-25, 99 S.Ct. at 2789, 2792 and *Pate v. Wainwright*, 607 F.2d 669, 670 (5th Cir. 1979) (*per curiam*).  The fact that most of the evidence against a defendant was circumstantial does not change the standard of review. *United States v. Zuniga-Salinas*, 945 F.2d 1302, 1305 (5th Cir. 1991) *citing United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989).

Moreover, review of the sufficiency of the evidence does not include review of the weight of the evidence nor the credibility of the witnesses, as those determinations are the exclusive province of the jury. *United States v. Young*, 107 Fed. Appx. 442, 443 (5th Cir. 2004) *citing United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993); *Garcia*, 995 F.2d at 561 *citing United States v. Greenwood*, 974 F.2d 1449,1458 (5th Cir. 1992); *United States v. Straach,* 987 F.2d 232, 237 (5th Cir. 1993); *Schrader*, 904 F.2d at 287; *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999); *see also Jackson*, 443 U.S. at 319

28

(noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

Accordingly, "whether judges doubt the credibility of a witness, even an accomplice witness cooperating with the government, is beside the point . . . ." *Greenwood*, 974 F.2d at 1458.  All credibility choices and conflicting inferences are to be resolved in favor of the verdict.  *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) *citing Cyprian*, 197 F.3d at 740.  The reviewing court is not authorized to substitute its interpretation of the evidence for that of the fact finder. *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir.1985).

## A.  Attempted First Degree Murder; Conspiracy to Commit First Degree Murder

Texada argues that the evidence was insufficient to support his convictions for the June 12, 1997 attempted first degree murder of Liza Jackson and Raven Richard because the State did not prove that he had a specific intent to kill.  He further asserts that his specific intent cannot be inferred from the circumstances surrounding the shooting. More specifically, petitioner argues that "other than the self-serving testimony of these three individuals [Louis Daniel Freeman, Keith Jermaine Henry and Kevin Pitre] no evidence was presented that he gave orders to have Mark Richard or any other individuals shot." In support of his claim, Texada further argues that the testimony of Freeman, Henry and Pitre "must be viewed with extreme caution", given that they "benefitted from plea bargains in return for their testimony." Accordingly, he suggests that their testimony

"should have been given little if any weight at trial", and that it was error to rely on their testimony to find the evidence sufficient to find him guilty.  Moreover, he points out that Freeman's testimony " changed several times", and was therefore not credible.

Under Louisiana law first degree murder is defined as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." La.R.S. 14:30(A)(3).  A person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and "does or omits an act for the purpose of and tending directly toward the accomplishing of his object . . . ." La. R.S 14:27(A).

Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Since specific intent is a state of mind, it need not be proved directly but may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So.2d 1126, 1127 (La.1982); *State v. Broaden*, 780 So.2d 349, 362 (La. 2001).  To be guilty of attempted murder, a defendant must have the specific intent to kill and not merely the specific intent to inflict great bodily harm.  *State v. Butler*, 322 So.2d 189, 192-193 (La. 1975); *State v. Huizar,* 414 So.2d 741, 746 (La.1982); *State v. Maten*,  899 So.2d 711, 716 (La.App. 1 Cir. 3/24/05), *writ denied,* 922 So.2d 544 (La.1/27/06).

Specific intent can be inferred from the circumstances, and from the actions of the defendant. *State v. Harris*, 812 So.2d 612, 618 (La. 2002); *State v. Brown*, 907 So.2d 1, 22 (La. 2005). Thus, pointing a gun at the victim and firing the gun has been found to be sufficient evidence to infer specific intent to kill or do great bodily harm. *State v. Brooks*, 839 So.2d 1075, 1079 (La. App. 2nd Cir. 2003) *citing State v. Procell*, 365 So.2d 484 (La. 1978). Moreover, firing multiple shots into a group of people has been found to be sufficient evidence to infer a specific intent to kill or inflict great bodily harm on more than one person to support an attempted first degree murder conviction. *State v. Butler,* 618 So.2d 572, 573 (La. App. 2nd Cir. 1993); *State v. Brown,* 966 So.2d 1138, 1142-1143 (La. App. 3rd Cir. 2007); *see also State v. Gilliam*, 827 So.2d 508, 514-515 (La. App. 2nd Cir. 2002) (indiscriminately shooting rounds into an occupied vehicle is sufficient evidence of specific intent to support first degree murder conviction).

Likewise, the discharge of a firearm in the direction of a crowd of innocent bystanders has repeatedly been recognized in the Louisiana jurisprudence as sufficient to prove specific intent to kill or inflict great bodily harm. *State v. Mitchell*, 894 So.2d 1240, 1249 (La. App. 2nd Cir. 2005) (citations omitted).

Under Louisiana law, "all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime", are principals. La. R.S. 14:24; *State v. Hampton*, 865 So.2d 284, 291 (La. App. 2nd Cir. 2004). Those persons who knowingly participate in the

planning or execution of a crime are principals.  *State v. Pierre*, 93-0893 (La.2/3/94) 631 So.2d 427, 428. A person may be convicted of intentional murder even if he has not personally struck the fatal blows.  *State v. Mitchell*, 894 So.2d 1240, 1244 (La. App. 2nd Cir. 2005).  The State may prove a defendant guilty by showing that he served as a principal to the crime by aiding and abetting or counseling or procuring another to commit the crime. La. R.S. 14:24; *State v. Griffin,* 2009 WL 3162171, *4 (La. App. 1st Cor. 2009); *State v. Smith*, 450 So.2d 714 (La. App. 4th Cir.1984).

A principal is just as liable as the person who directly commits the crime.  *State v. Texada*, 734 So.2d 854, 860 (La. App. 3rd Cir. 1999).  However, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state.  *State v. Neal*, 2000-0674, pp. 12-13 (La.6/29/01), 796 So.2d 649, 659, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); *Pierre*, 93-0893 (La.2/3/94) 631 So.2d at 428. Thus, in cases where the defendant "did not pull the trigger . . . the circumstances [must] indicate that he also actively desired the death of or great bodily harm to the victim."  *Mitchell*, 894 So.2d at 1250 *citing State v. Holmes*, 388 So.2d 722, 727 (La. 1980).

The elements of the crime of conspiracy are (1) an agreement or combination of two or more persons for the specific purpose of committing a crime and (2) an act done in furtherance of the object of the agreement or combination. La. R.S. 14:26; *Hampton*, 865 So.2d at 291*citing State v. Valrie*, 749 So.2d 11 (La.App. 3 Cir. 10/13/99).  Specific

intent is required to convict for conspiracy.  *Hampton*, 865 So.2d at 290 *citing State v. Guillory*, 540 So.2d 1212, 1215 (La. App. 3rd Cir. 1989); *State v. Barton*, 857 So.2d 1189,1200 (La. App. 5th Cir. 2003).  The "essence" of the crime of conspiracy is the agreement to commit a criminal act. *State v. Richards*, 426 So.2d 1314, 1317 (La. 1982).

For purposes of the crime of conspiracy, specific intent may be inferred from the circumstances of the transaction and actions of the defendant.  *Hampton*, 865 So.2d at 290 *citing State v. Johnson,*817 So.2d 120 (La. App. 3 Cir. 02/06/02) and *State v. Taylor,* 688 So.2d 1262, 1268 (La. App. 3 Cir. 02/05/97).  The overt act need not be unlawful; it may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of the object of the agreement.   *Id.*, *Richards*, 426 So.2d at 1317.

Direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.  *State v. Austin*, 399 So.2d 158, 160 (La.1981);  *State v. Lilly*, 468 So.2d 1154, 1158 (La. 1985).

The claim presented to this court is identical to that presented to the Third Circuit on direct appeal.  On direct appeal, the Louisiana Third Circuit Court of Appeal extensively summarized the testimony presented at trial and, thereafter, found that the evidence was sufficient to support petitioner's attempted first degree murder and conspiracy convictions.

33

In reaching this conclusion, the court, while not expressly citing the United States Supreme Court's decision in *Jackson v. Virginia,* nevertheless applied this standard, and expressly found that "the evidence, viewed in a light favorable to the State" was sufficient to support petitioner's attempted murder and conspiracy convictions.  This conclusion was based on numerous factual and legal determinations from both the direct and circumstantial evidence presented at trial, which was summarized above.

Specifically, the court found that Texada's specific intent to kill was amply supported by evidence demonstrating that Freeman and Jones, acting under Texada's direction, fired at a group of people, which resulted in two life-threatening injuries, and that because Texada directly counseled or procured them to commit the shooting, he was therefore guilty of the offense as a principal.  *Id.* at 474.

Moreover, given the evidence indicating that Texada'a instructions to Freeman and Jones included shooting certain people and whoever was in the area, the court found that Texada acted in combination with others for the specific purpose of committing first degree murder. *Id. citing State v. Texada*, 734 So.2d 854 (La. App. 3rd Cir. 1999) *citing State v. Watson*, 397 So.2d 1337 (La. 1981).

Under the appropriate standard of review, this court cannot find that the state court's decision was contrary to, or an unreasonable application of, federal law, nor that the state court's factual determinations were unreasonable in light of the State court record.

34

Indeed, Texada himself acknowledges that the testimony of Freeman, Henry and Pitre supports a finding that he (Texada) gave orders to have Mark Richard and others shot.  However, as he did in the Third Circuit on direct appeal, Texada urges this court to make a credibility determination based on these witnesses' plea and immunity agreements with the State, which the record discloses were fully disclosed to the jury by each witness during his testimony.[4]

As found by the Third Circuit, on a sufficiency of the evidence review, it is not the province of the court to make credibility determinations or to review the weight of the evidence accepted by the jury. *See Young, Garcia, Greenwood*, *Schrader*, *Straach, Cyprian* and *Ramirez*, *supra*.  Although the jury could have accepted the testimony of Texada, McDowell, Mark Richard and West, supporting Texada's defense, and accordingly, could have made contrary inferences from the evidence presented, the jury chose instead to credit the testimony of Freeman, Henry and Pitre.

Their testimony establishes that Texada gave Freeman and Jones guns and ordered them to fire those guns at multiple persons, as well as all others in the area, in retaliation for what Texada perceived was an act of disrespect against members of the 5/9 Bloods gang.[5] This court cannot find the testimony accepted by the jury so incredible or insubstantial that, as a matter of law, it can be discounted.

---

[4] tr. pg. Henry 2253-2256, 2259-2262, 2537; Pitre 2386-2397, 2540; Freeman 2202-2205, 2170-2173

[5] tr. pg. Freeman 2146, 2191-2195, 2166-2167, 2169, 2188; Henry 2247, 2249-2252, 2270-2272, 2276, 2256, 2250-2253, 2264, 2267; Pitre 2376, 2379-2381, 2383-2384.

While the record demonstrates that in post-conviction proceedings Pitre recanted his trial testimony, testifying that he was the leader of the gang and that he had ordered the shooting, the United States Supreme Court has recently confirmed that in reviewing a sufficiency of the evidence claim under *Jackson*, review is limited to consideration of the evidence admitted at trial by the trial court. *McDaniel v. Brown*, - - U.S. - -, 130 S.Ct. 665 (2010). However, even if the testimony of Pitre is not considered, the testimony of Freeman and Henry amply support Texada's convictions for both attempted first degree murder and conspiracy to commit first degree murder. Both Freeman and Henry testified that Texada was the gang leader and that Texada had ordered the shooting which occurred on June 12, 1997.[6]

Moreover, the testimony of Freeman and Henry established that they agreed, however reluctantly, to perform the tasks assigned to them by Texada, Freeman to shoot and Henry to drive the getaway vehicle, and further that Texada committed several acts in furtherance of the charged conspiracy, one of which was to supply the shooters with guns.[7] Indeed, that is exactly what the trial court found in denying post-conviction relief, Pitre's recantation does not outweigh the extensive testimony given during trial by Pitre

---

[6] tr. pg. Freeman 2146, 2191-2195; Henry 2247, 2249-2252, 2270-2272, 2276.

The undersigned notes that because petitioner's convictions are amply supported by other competent and un-discredited testimony, any claim of actual innocence asserted by Teaxada with respect to those claims previously found by this court to be procedurally defaulted must necessarily fail.

[7] tr. pg. Freeman 2166-2167, 2169, 2188; Henry 2256, 2250-2253, 2264, 2267.

and Texada's accomplices.[8]

It has long been established that recanting testimony must be viewed with extreme suspicion. *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003). Given that Pitre changed his trial testimony in May, 2005, almost seven years after Texada's November, 1998 trial, after he served the two year sentence he received in his plea bargain, and only after then receiving three consecutive life sentences for crimes committed in Evangeline Parish (for which he is incarcerated at the Louisiana State Penitentiary, the same prison as Texada), the undersigned finds that the trial court's unwillingness to credit Pitre's recanted testimony in post-conviction proceedings was entirely reasonable.[9]

The same is true with respect to petitioner's claim regarding Freeman's testimony. By Reply, Texada contends that Freeman's testimony should not be considered. Texada argues that Freeman's  plea agreement with the State (represented by ADA Barry Fontenot) provided for him to enter a guilty plea to two counts of attempted first degree murder in exchange for the State's promise to recommend a maximum sentence of twenty-five years imprisonment.  However, by letters dated February 26, 2001, which Texada asserts that he did not receive until May 4, 2006, another ADA (Donald J. Richard), apparently advised the Clerk of Court that charges under a different docket

---

[8]rec. doc. 20-3, at pg 25 *citing State v. Clayton*, 427 So.2d 827, 833 (La. 1982) (finding that recantations of trial testimony should be looked upon with the utmost suspicion, and therefore, rejecting the recantations of two witnesses, because their recanted testimony was contrary to their trial testimony which was consistent with the testimony of other witnesses, and because, even if accepted, would have been contrary to other witnesses' testimony).

[9]*See* tr. pg. 1203.

number (98-K-2465-D) had been dismissed without prosecution and, accordingly, authorized the Sheriff to release Freeman on only two counts of attempted first degree murder under the referenced docket number.

Under *McDaniel v. Brown,* this evidence cannot be considered on sufficiency of the evidence review.  Moreover, given that the letters reference a different docket number, do not disclose the basis for the dismissal and were issued almost four years after execution of the plea agreement, even if this court could consider this evidence, the undersigned would not assign them any weight.  There are a myriad of reasons why the State might dismiss charges against Freeman, none of which necessarily impugn the veracity of Freeman's trial testimony.  At the time Freeman testified against Texada, he faced serious attempted murder and drug charges for which he faced a virtual life sentence.

Petitioner has produced no legally cognizable evidence to undermine the jury's determination that Freeman's trial testimony was anything but truthful. To the contrary, the evidence presented at the trial supports the jury's credibility determination. Over one year prior to execution of his plea agreement, when no offer of a reduced sentence or immunity had been made by the State, Freeman told the same story to Officer Harrison on June 12, 1997, immediately following his arrest, and Freeman's videotaped statement was played to the jury.[10]  Finally, even if this court did not consider Freeman's testimony, the

---

[10]tr. pg. 2280-2282, 2289-2290, 2296.

testimony of Pitre and Henry amply support Texada's convictions for both attempted first degree murder and conspiracy to commit first degree murder.[11]

In light of the above, viewing the evidence in the light most favorable to the prosecution as is required by *Jackson* and its progeny, the evidence presented at trial was sufficient to sustain petitioner's convictions on *habeas* review. Considering  the "great weight" afforded  to the state court's determination and the above summarized evidence, the undersigned finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Accordingly, this claim does not warrant *habeas* relief.

### B.  Distribution of Cocaine/Solicitation of a Minor to Distribute Cocaine

Texada argues that there was insufficient evidence to support his convictions for the October 25, 1996 distribution of cocaine to Danny Freeman, who was under the age of eighteen, and soliciting Freeman, a minor, to distribute that cocaine.  He complains that the jury erroneously relied on the testimony of Danny Freeman, and that the other "circumstantial" evidence did not show that a drug deal occurred, particularly given that Sandra Guillory volunteered to "set up" Texada and was paid for her role in the transaction.  Texada further asserts that there was no evidence to corroborate Officer Gallow's testimony that the voices on the tape which was played to the jury were those of Texada and Sandra Guillory.

---

[11]*See* fn. 5, *supra.*

Louisiana Revised Statute 40:967 prohibits the distribution of controlled dangerous substances listed in Schedule II, which Schedule includes cocaine.  Increased penalties may be imposed when a person, who is at least eighteen, is convicted of distributing cocaine to a person under eighteen years of age, who is at least three years his junior.  La. R.S. 40:981(B).  Additionally, Louisiana Revised Statute 40:981.2 forbids persons eighteen or older from soliciting, procuring, or counseling any person under eighteen to distribute, or attempt to distribute, controlled dangerous substances listed in Schedules I through V, which Schedules include cocaine.

On direct appeal, the Louisiana Third Circuit Court of Appeal extensively summarized the testimony presented at trial and found that the evidence was sufficient to support both of petitioner's convictions because there was sufficient evidence to prove that "Texada, twenty-two years old at the time, distributed cocaine to fifteen-year-old Freeman, seven years his junior, and that he procured Freeman to distribute cocaine to [government cooperator] Guillory."

Under the appropriate standard of review, this court cannot find that the state court's decision was contrary to, or an unreasonable application of, federal law, nor that the state court's factual determinations were unreasonable in light of the State court record.

The testimony of the investigating police officers clearly demonstrated that Sandra Guillory agreed to help the police by participating in an undercover drug transaction with

40

Texada.[12]  With Officer Gallow present and taping her conversations, Guillory called

Texada.[13]  Guillory asked Texada to meet her with sixty dollars worth of cocaine.  Texada

replied that he would send someone to meet her at a gas station.[14]  The tape was played to

the jury and the male voice on the tape was identified by Officer Gallow as that of

Texada, who Gallow knew well.[15]  Guillory was fitted with a body microphone and given

money to buy the cocaine.  Both her purse and vehicle were searched before leaving he

residence.[16]  The officers followed Guillory to the gas station.  Gallow listened to the

transaction; he could not, however, see the transaction from his location.[17]

Officer James testified that he viewed the transaction from a vehicle.[18]  He

witnessed Guillory arrive and get out of her car and Freeman and others arrive and exit

another car; Freeman then approached Guillory, while the others formed a "perimeter."[19]

While he did not see money exchanged, James testified that he saw an exchange take

place.[20]

---

[12]tr. pg. 2033-2034. In exchange for her assistance, Guillory was given money for food for her child. tr. 2101, 2113.

[13] tr. pg. 2036-2037.

[14] tr. pg. 2034-2036; 2092-2093.

[15]tr. pg. 2035, 2092-2093.

[16]tr. pg. 2094.

[17]tr. pg. 2093-2094.

[18]tr. pg. 2073-2074.

[19] tr. pg. 2073-2074; 2078-2079.

[20]tr. pg. 2073-2074.

Captain Trahan set up video surveillance.  The transmission from Guillory's body microphone and video were simultaneously recorded.  The video of the transaction was played for the jury.[21]  Trahan additionally testified that he saw Freeman and McDowell get out of the vehicle when the drug transaction occurred.[22] Furthermore, he testified that he had investigated thousands of drug transactions and that this transaction was typical.[23]

Following the transaction, the substance obtained by Guillory in the transaction with Freeman was sent to the Acadiana Crime Lab.  Testing by the lab revealed that the substance obtained in the transaction contained cocaine.[24]

Freeman testified that he was with Texada when Texada received a call from "Sandy", requesting Texada to sell her sixty dollars of cocaine.[25]  Texada then went to his trailer, "cut three rocks down", handed the rocks to Freeman and instructed Freeman to take the cocaine to Guillory.[26]  When Freeman arrived at the gas station, he sold the cocaine he received from Texada to Guillory for sixty dollars.[27]  Freeman later gave the money to Texada.[28] Freeman identified himself, Guillory and McDowell, another gang

---

[21]tr. pg. 2105.

[22]tr. pg. 2107.

[23] tr. pg. 2110-2113.

[24]tr. pg. 2062-2063.

[25] tr. pg. 2156.

[26]tr. pg. 2156.

[27]tr. pg. 2157-2158, 2163.

[28] tr. pg. 2159.

member, on the video taken by the police of the transaction.[29]

Texada was twenty-four years old at the time of trial, making him twenty two years old at the time of the October 25, 1996 transaction; Freeman testified that he was fifteen at that time.[30]

Based on the above, there was sufficient evidence to convict Texada on these drug counts.  The jury was presented with the eyewitness testimony of  Freeman, and the Officers (Gallow, James and Trahan), as well as the tape and video recordings obtained in connection with the transaction, all of which established that a drug transaction had occurred between Guillory and Freeman, pursuant to Texada's instructions to Freeman.

While Texada complains of the absence of corroborating testimony as to the male voice on the tape, no corroboration was necessary.  The jurors were free to believe that because Officer Gallow knew Texada well, he could competently identify the male voice was, indeed, that of Texada. Finally, the jurors were aware that Freeman had obtained a plea bargain for his truthful testimony and that Guillory had been paid for her assistance, and they were likewise free to assign the proper weight accorded this testimony. Texada's complaints go to the weight, not the sufficiency, of the evidence.

In light of the above, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Accordingly, this claim does not warrant *habeas* relief.

---

[29]tr. pg. 2158-2159.

[30] tr. pg. 2588, 2163.

43

### C.  Criminal Gang Related Activities

Texada argues that there was insufficient evidence to support his convictions for promotion of criminal gang related activities.  More specifically, he argues that "despite the two year investigation conducted by the state, there was no indication that the group of individuals who hung around Texada's residence were a street gang engaged in criminal activities."

In support of his argument, Texada discounts Officer Harrison's testimony, noting that of the entire two year observational period, the jury was presented a redacted video of only a two day period (April 30, 1997 and May 1, 1997).  He further asserts that none of the activities on the tape were shown to be gang related and that there was no drug dealing depicted.  He further discounts Harrison's testimony regarding the hierarchy of the gang because Harrison received this information from gang members during interviews after their arrest.  Moreover, Texada notes that Harrison's testimony regarding the arrest of one of the individuals depicted on the video surveillance tape for possession of cocaine (immediately following his departure from the Bossier Street property) is suspect, given that the individual left the residence on foot and was later arrested during a vehicular stop.

Texada additionally notes that the state's evidence regarding his income and vehicles, despite his lack of routine employment, was contradicted by defense evidence demonstrating that one of the vehicles was owned by Texada's mother, the others were

44

allegedly of little value, and that Texada raised dogs for profit, helped his girlfriend sell clothes out of her vehicle and received Social Security benefits for a medical condition (epileptic seizures).

With respect to the photographs of gang related graffiti near Texada's Bossier Street residence, Texada asserts that "other than the self-serving testimony of Freeman, there was no indication that Texada had anything to do with spray painting the graffiti." He also complains that there was no indication that any of the red bandanas confiscated by Officer Harrison were Texada's. Again these complaints go the weight, not the sufficiency, of the evidence.

The last five counts of petitioner's indictment alleged that the five criminal offenses discussed above (attempted first degree murder, conspiracy to commit first degree murder distribution to a minor and solicitation of a minor to distribute drugs) were committed for the benefit of, at the direction of, and/or in association with, a criminal street gang (the 5/9 Bloods a/k/a the Bossier Street Hustlers), with the intent to promote, further, or assist in the affairs of the criminal street gang. [tr. pg. 2819].

Louisiana Revised Statute 15:1403(B) provides:

> Any person who is convicted of a felony or an attempted felony which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the intent to promote, further, or assist in the affairs of a criminal gang, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be imprisoned for not less than one year nor more than one-half of the maximum term of imprisonment provided for that offense.

"Criminal street gang" is defined in Louisiana Revised Statute 15:1404 as follows:

A. As used in this Chapter, "criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, which has as one of its primary activities the commission of one or more of the criminal acts enumerated in Paragraphs (1) through (8) of Subsection B of this Section or which has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.

B. As used in this Chapter, "pattern of criminal gang activity" means the commission or attempted commission of two or more of the following offenses, provided at least one of those offenses occurred after September 7, 1990 and the last of those offenses occurred within three years after a prior offense, and the offenses are committed on separate occasions or by two or more persons:

(1) Aggravated battery or second degree battery as defined in R.S. 14:34 and R.S. 14:34.1.

(2) Armed robbery as defined in R.S. 14:64.

(3) First or second degree murder or manslaughter, as defined in R.S. 14:30, 30.1, and 31.

(4) The sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances, as defined in R.S. 40:961 et seq.

(5) Illegal use of weapons or dangerous instrumentalities, as defined in R.S. 14:94.

(6) Aggravated arson as defined in R.S. 14:51.

(7) Intimidating, impeding, or injuring witnesses; or injuring officers, as defined in R.S. 14:129.1.

(8) Theft, as defined in R.S. 14:67, of any vehicle, trailer, or vessel.

Added by Acts 1990, No. 230, § 1.

On direct appeal, the Louisiana Third Circuit Court of Appeal extensively summarized the testimony presented at trial and, thereafter, found that the evidence was sufficient to support all five of petitioner's convictions.  The evidence showed that the 5/9 Bloods was a criminal street gang as defined by the statute, as it was comprised of more than three members and its primary activity was the sale and possession of controlled substances. Moreover, the court found that the attempted first degree murders and conspiracy to commit murder, were ordered by Martin Texada in retaliation for disrespect to his gang, and were committed in association with the gang with the intent to promote or further its affairs. Likewise, the court found that the drug transaction Freeman handled, at Martin Texada's request, was to benefit the gang with the intent to promote, further, or assist in its affairs.  Thus, Texada's claim was meritless.  *Id*. at 479.

Under the appropriate standard of review, this court cannot find that the state court's decision was contrary to, or an unreasonable application of, federal law, nor that the state court's factual determinations were unreasonable in light of the State court record.

Freeman, Henry and Pitre all classified the 5/9 Bloods as a gang and each likewise testified that Martin Texada led the gang.[31]  Freeman and Henry named the following members: Earl West, Michael "Squirrel" McDowell, Eddie Texada, Lyle Raheem Jones,

_____

[31] tr. pg. Freeman 2145-2146; Henry 2245-2247; Pitre 2376, 2379, 2381.

Henry, Pitre, John Texada, and Melvin Lewis.[32]  The testimony of Freeman, Henry and

Pitre is corroborated by that of Officer Harrison who testified as to the hierarchy of the

gang led by Texada and the numerous gang related symbols in and around the Bossier

Street residence, and rendered her expert opinion that the activities she observed at the

Bossier Street residence were typical of gang related drug trafficking activity.[33]

Moreover, it is clear from the testimony of Freeman, Henry, Pitre and Officer

Harrison that the primary activity of the gang was the possession and sale of controlled

substances.[34]  This testimony was corroborated by the testimony of Sergeant Trahan and

expert forensic chemist Ardoin that cocaine had been found on the Bossier Street property

during an April 2, 1997 search.[35]  Moreover, there was testimony presented that during

another search of the premises cocaine and drug paraphernalia had been found.[36]

Freeman, Henry and Pitre likewise affirmed that the June 12, 1997 shooting was

the done on Texada's order in retaliation for Mark Richard's disrespect to gang members

West and Lewis.[37]  Freeman's testimony establishes that the drug  sale he made to

---

[32] tr. pg. Freeman 2146-2147; Henry 2246.

[33] tr. pg. 1870-1885, 1940.

[34]tr. pg. Freeman 2149, 2152-2153, 2155, 2160-2162; Henry 2245-2247; Pitre 2380-2381, 2400-2401;
Harrison 1915-1940, 1963-1970.

[35] tr pg. Trahan 2337-2340; Ardoin 2334-2330.

[36] tr. pg. 1897-1903; Ardoin 1982-1983.

[37]tr. pg. Freeman 2146, 2191-2195, 2166-2167, 2169, 2188; Henry 2247, 2249-2252, 2270-2272, 2276,
2256, 2250-2253, 2264, 2267; Pitre 2376, 2379-2381, 2383-2384.

Guillory was in furtherance of the gang's business as it was made at Texada's request.[38]
Thus, there was sufficient evidence to support all of Texada's gang related convictions.

Texada discounts Freeman's testimony and Officer's Harrison's expert assessment
of the activities which occurred at the Bossier Street gang headquarters, arguing that the
jury should have instead accepted the testimony of defense witnesses Eddie Texada (who
denied the existence of the gang) and Johnson (who initially denied knowledge of the
Bossier Street Hustlers and denied Texada's 5/9 Bloods membership).  However, the
testimony given by both witnesses was thoroughly impeached during cross examination
by the State, as set out above.  The jury made credibility determinations, and it is not for
this court, in the context of a sufficiency of the evidence claim, to supplant the jury's
determinations.  The same is true with respect to Texada's own testimony regarding his
vehicles, finances and sources of income.

The undersigned further notes that while Texada complains that he did not spray
paint the gang symbols as Freeman testified he had, that none of the confiscated red
bandanas entered into evidence were taken from him, and that the drugs seized during a
May 8, 1996 search did not belong to him.  Texada misses the point of this testimony.
The testimony was offered to show the existence of the gang and the gang's primary
activity, not to implicate Texada personally or directly in the acts.  Texada's gang
affiliation, membership and leadership was shown through other testimony given by

---

[38]tr. pg. 2156-2157, 2163.

Freeman, Henry, Pitre and Officer Harrison.

In light of the above, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Accordingly, this claim does not warrant federal  *habeas* relief.

## II.  Excessive Sentence

Petitioner argues that his sentences totaling 315 years, is constitutionally excessive. Specifically, petitioner argues that although his convictions for gang related criminal conduct were required to be imposed consecutively, the court abused its discretion under Louisiana criminal code article 883 by ordering four of the other five sentences to run consecutively.  He further argues that the while each of his sentences fall within the statutory limits, his sentence is nevertheless excessive because the court imposed the maximum possible penalty for each crime.

In rejecting this claim on direct appeal, noting that a sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense, the Third Circuit found that petitioner's 315 year sentence, which was essentially a life sentence, was "more than appropriate for the atrocities he has inflicted on others." *Texada*, 456 So.2d at 480-482.  In so finding the court noted Texada's history of criminal activity, his obvious lack of regard for human life and his gross disrespect for society, as well as the fact that he led the gang and used his position of authority to influence others to engage in egregious criminal activity. *Id*. at 481-482.

Under the appropriate standard of review, this court must defer to the state court's

determination, which is entirely correct under the applicable federal law.

Generally, the Eighth Amendment protects against not only barbaric punishments,

but also those that are grossly disproportionate to the crime committed.  *Solem v. Helm,*

463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); *Ewing v. California*, 538 U.S. 11,

20-24 (2003); *Lockyer*, 538 U.S. at 72.  However, "[for] crimes concededly classified and

classifiable as felonies, . . . the length of the sentence actually imposed is purely a matter

of legislative prerogative." *Harmelin v. Michigan,* 501 U.S. 957, 962, 111 S.Ct. 2680, 115

L.Ed.2d 836 (1991) *quoting Rummel v. Estelle,* 445 U.S. 263, 274, 100 S.Ct. 1133, 63

L.Ed.2d 382 (1980).  A federal *habeas* court will not upset a state sentence within

statutory limits unless it is so disproportionate to the offense as to be completely arbitrary

and shocking.  *Bonner v. Henderson,* 517 F.2d 135, 136 (5th Cir.1975).  In this regard, a

"[court] must grant substantial deference to the broad authority that legislatures

necessarily possess in determining the types and limits of punishments for crimes."

*United States v. Gonzales,* 121 F.3d 928, 942 (5th Cir.1997); *see also Ewing*, 538 U.S. at

24-25.

In light of *Solem's* general constitutional principle and other relevant

jurisprudence, the Fifth Circuit has set forth its methodology for analyzing excessive

sentence claims in *McGruder v. Puckett,* 954 F.2d 313, 315 (5th Cir.1992).  First, the

court weighs the gravity of the offense against the severity of the sentence.  *McGruder*,

954 F.2d at 316.  Then, if the court determines that the sentence is grossly disproportionate to the offense, the court compares (2) sentences for similar crimes in the same jurisdiction and (3) sentences for the same crime in other jurisdictions.  Only if the court concludes in the first inquiry that the sentence is "grossly disproportionate" to the offense, does the court proceed to the second and third inquiries.  *United States v. Gonzales*, 121 F.3d 928, 942-943 (5th Cir. 1997).  If the court concludes that the sentence is not "grossly disproportionate," the inquiry is finished, and the court "defer[s] to the will of [the legislature]."  *Gonzales*, 121 F.3d at 942-43.

Here, the issue of whether petitioner's sentence is unconstitutionally excessive turns on whether petitioner's punishment arrives at this threshold level of gross disproportionality.   The Supreme Court noted the inherent subjectivity in making this threshold determination in *Rummel.* 445 U.S. at 304.  Moreover, the Supreme Court has noted that outside of the capitol punishment context, successful proportionality challenges are "exceedingly rare" and constitutional violations are therefore reserved only for an "extreme" "extraordinary case."   *Ewing*, 538 U.S. at 21; *Lockye*r, 538 U.S. at 73 and 77.

In *Rummel,* the Supreme Court upheld a life sentence under a recidivist statute for a petitioner who had fraudulently used a credit card, passed a forged check, and finally, obtained $120.75 under false pretenses.  Subsequent jurisprudence in this circuit has used *Rummel* as a benchmark for distinguishing constitutional sentences and grossly disproportionate punishments. *Gonzales,* 121 F.3d at 943.

Measured against the *Rummel* benchmark, petitioner's 315 year sentence, which is essentially a life sentence, imposed in connection with Texada's ten felony convictions, all of which are within the statutorily prescribed limits, is plainly constitutional.  First, the gravity of the offenses committed by petitioner are clearly more severe than the crimes of fraud and forgery punished by life imprisonment in *Rummel*.  By ordering two other gang members to take a rival gang member's life and to shoot into an area where bystanders would undoubtedly be present, petitioner nearly caused two innocent young women to be killed.  Second, unlike the crimes at issue in *Rummel*, the crimes committed by petitioner, that is, deliberately ordering an act of retaliation which almost resulted in two deaths, and orchestrating as well as operating a drug trafficking criminal gang operation, warrants the most severe punishment.

Finally, the record reveals that, while petitioner was only twenty-four years old at the time of his sentencing, petitioner had a juvenile record, had previously been convicted of aggravated battery and aggravated escape, and had a felony carnal knowledge of a juvenile charge pending disposition.[39]

Accordingly, applying the benchmark test set forth in *Rummel,* the undersigned finds that the facts of this case do not meet the threshold level of gross disproportionality; therefore, the sentences are consistent with the constitutional requirements of the Eighth Amendment.  Thus, petitioner's claim is without merit.

---

[39]tr. pg. 2716.

## III.  Denials of a Mistrial

Petitioner contends that the trial court abused its discretion in failing to grant a mistrial on four separate occasions: (1) following a remark about dogfighting from Officer Trahan; (2) after Freeman testified that Texada spray painted the gang's symbol on a sign and that drugs were sold from Texada's residence; (3) when, in response to a question asked by defense counsel, Assistant District Attorney Tromblay stated that he charged another member of the gang because, amongst other reasons, he had information that the gang member shot another victim at the direction of Texada; and (4) when the State used an exhibit displaying the gang's hierarchy with Texada's name at the top.

Initially, the undersigned notes that petitioner's claims are not cognizable in this federal *habeas* proceeding because in both the state courts and in this court petitioner has presented these claims for relief solely under state law.  Thus, the state court's determination that the claims are without merit should not be disturbed since the ruling was based on state, rather than federal, law.  Of course, this court may grant *habeas* relief only for violation of federal law.

In both this court and the Louisiana state courts, Texada asserted his mistrial claims entirely under Louisiana state law.[40] [rec. doc. 40, manual attachment].

---

[40]There is no mention or argument of any federal constitutional issue or any federal law supporting a federal claim.  "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief . . . by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.' " *Howell v. Mississppi,* 543 U.S. 440, 125 S.Ct. 856, 859 (2005) *citing Baldwin,* 541 U.S. at 32.  This is necessary to establish that a federal question was properly presented to a state court. *Id.*  Moreover, the burden is on the petitioner to raise his federal claim in the state courts at a time when state procedural law permits its consideration on the merits, even if the state

Accordingly, when addressing these claims on direct appeal, the Louisiana Third Circuit Court of Appeal analyzed these claims under Louisiana standards, specifically, Louisiana Code of Criminal Procedure articles  771 and 775, and *State v. Prieur*, 277 So.2d 126 (La. 1973) (discussing when notice of other crimes evidence is required)*.  Texada,* 756 So.2d at 482-488.

It is not the province of this court to determine if the state courts properly applied state law.  *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct.  475, 480 (1991)*;  Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998).  Federal courts "do not sit as a super state supreme court . . . ." *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983).  Rather, "[f]ederal *habeas corpus* review is limited to errors of constitutional dimension . . . ." *Castillo v.  Johnson*, 141 F.3d 218, 222 (5th Cir. 1998);  *Estelle,* 502 U.S. at 68, 112 S.Ct. at 480 ("A federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States"); 28 U.S.C. § 2254(a).  Accordingly, petitioner's claims are not cognizable on federal *habeas* review and should be dismissed.

To the extent petitioner's allegations may be construed as asserting claims for denial of due process, those claims are also without merit.  Generally, under Louisiana law, determination of whether a mistrial should be granted is within the sound discretion of the trial court. *See State v. Fugler,* 737 So.2d 894, 895 (La. App. 1ˢᵗ Cir. 1999) *citing State v. Berry,* 684 So.2d 439, 449 (La. App. 1ˢᵗ Cir. 1996); *State v. Duval*, 747 So.2d

---

court could have identified and addressed the federal question without its having been raised.  *Bell v. Cone*, 543 U.S. 447, 125 S.Ct. 847, 851 at fn. 3 (2005) *citing Baldwin,* 541 U.S. at 30- 32.

793, 797 (La. App. 1st Cir. 1999); La.C.Cr.P. art. 775.  A mistrial is a drastic remedy and is only warranted when the defendant has suffered substantial prejudice. *Fugler,* 737 So.2d at 895; *Berry,* 684 So.2d at 449; *Duval,* 747 So.2d at 797; *State v. Edwards,* 420 So.2d 663, 679 (La.1982); *State v. Harris*, 812 So.2d 612, 617 (La. 2002).

In order to obtain federal *habeas corpus* relief on grounds of trial error, the petitioner must show more than prejudice to his substantial rights.  *Kirkpatrick v. Blackburn,* 777 F.2d 272, 279 (5th Cir.1985).  The petitioner must establish that the trial error was not merely an abuse of discretion, but also was so grave as to amount to denial of his constitutional right to due process, that is, that the error rendered the trial fundamentally unfair.  *Id.*  A trial is fundamentally unfair only when there is a reasonable probability that the verdict might have been different had the trial been properly conducted.  *Id.*  For the reasons which follow, in this case, petitioner has not established that the denial of his motions for a mistrial constituted an abuse of discretion, or that the denial made his trial fundamentally unfair.

### A.  Dogfighting

The State asked Officer Trahan whether Texada had any lawful employment other than briefly being the operator or co-owner of a store.  Trahan replied that Texada rented a couple of buildings with the intent to start up a business.  He additionally noted "[a]nd I know that he did have some dogs that they would fight, and I think he fought those dogs

for money to bring in income."[41]

Defense counsel objected, arguing that a mistrial was warranted because the problem could not be cured by admonition. The prosecutor argued that the comment was unsolicited because he asked about *lawful* employment. Believing dog fighting to be a misdemeanor, the trial court found the comment "to be about as innocuous as if he would have said he was speeding thirty-five in a twenty-five mile an hour zone."[42] When the trial resumed the following day, defense counsel informed the trial court that dogfighting is a felony and because society detests dogfighting, the comment could not be erased from the jurors' minds. The trial court adhered to its earlier ruling, denying the mistrial motion. Defense counsel did not ask for an admonition.[43]

On direct appeal the Third Circuit found that the testimony was not deliberately elicited, was unsolicited and non-responsive, and therefore not chargeable against the State.  Moreover, the Third Circuit found that the trial court did not have a duty to admonish the jury absent a request by defense counsel.  *Id*. at 482-483.  Finally, the court found that failure to admonish the jury was harmless because of the "substantial evidence" of Texada's guilt.  *Id*. at 483.

From the above, it is clear that the trial court acted within its discretion when it denied petitioner's motion, and, considering that defense counsel did not request an

---

[41]tr. pg. 2000.

[42] tr. pg. 2000-2003.

[43]tr. pg. 2004-2005.

admonition, the denial of the motions did not render petitioner's trial so fundamentally unfair so as to violate petitioner's due process rights.  Petitioner has not established sufficient prejudice amounting to a denial of fundamental fairness.  Moreover, in light of the overwhelming evidence of petitioner's guilt, discussed in detail above, the undersigned is unable to say that petitioner has demonstrated that there was a reasonable probability that absent Officer Trahan's singular, unsolicited and non-responsive remark, the jury would have reached a different verdict.

### B.  Spray-painting/sale of drugs from Texada's residence

Next, Texada complains that the trial court erred in denying his request for a mistrial when Freeman testified that he (Texada) had spray-painted the gang's symbol on a sign and that drugs were sold from Martin Texada's residence.[44]  Following defense counsel's motion for a mistrial based on Freeman's alleged reference to other crimes, the trial court issued the following ruling:

> As I appreciate this particular statute, it deals with evidence of other crimes. It may be a charged crime and it may be an uncharged crime. It can be an uncharged crime which becomes an element of the overall pattern. You can only-you can charge just one crime, as I appreciate it, under the statute and may have fifty uncharged crimes as being necessary elements to meet the three or more. This is different from other crimes evidence which would generally come under the old KIP exceptions. It has nothing to do with that. These crimes under the KIP exception require the *Prieur* notices. We're dealing with elements of crimes. Those are handled by responses to the request for a bill of particulars to more fully inform the defendant of the nature and cause of the crime. And that's where we are right now. The defendant in this particular case has been informed through an answer by

---

[44]tr. pg. 2148-2149.

the State to the defendant's request for a bill of particulars concerning these other crimes. I do not consider them to be the types of crimes that require *Prieur* notices or *Prieur* hearings. I have a feeling that there's probably some divergent ideas regarding this [sic] particular aspects of this statute. This is my considered opinion of the statute at this time.[45]

On direct appeal, the Third Circuit likewise found that "[s]ince the offenses are essentially elements of La. R.S. 15:1403, they are not other crimes evidence and, thus, require no *Prieur* notice." *Id*. at 484. More specifically, the testimony regarding the sale of drugs from Texada's residence was necessary to meet the definition of "criminal street gang" contained in the statute and the testimony regarding the gang's symbol painted on the sidewalk and a sign, was necessary to show the existence of the gang's identifying symbol, as well as Texada's association with the gang. *Id*.

Federal courts will not grant *habeas* relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) *citing Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir.1983), *cert. denied*, 466 U.S. 984, 104 S.Ct. 2367, 80 L.Ed.2d 838 (1984). The erroneous admission of prejudicial evidence will justify *habeas* relief only if the admission was a crucial, highly significant factor in the defendant's conviction. *Id.* Here, the trial court committed no error, much less any error creating fundamental unfairness.

---

[45] tr. pg. 2150-2151.

In this case, evidence that petitioner spray painted the gang's symbol on a sign and that drugs were sold from Texada's residence are directly relevant to the five charges that petitioner committed acts in association with a criminal street gang, and constitute elements of the crimes charged. *See Muhammed v. Hubert*, 2007 WL 3104331, *9-10 (E.D. La. 2007) (finding no due process violation when alleged "other crimes evidence" was admitted during a state criminal trial, as the evidence formed a part of the elements of the offense and hence, did not fit the definition of "other crimes evidence."); *see also Lampton v. Cain*, 2007 WL 837184, *5 (E.D. La. 2007) (noting that alleged evidence of "other crimes" was properly admitted under Louisiana state law because the challenged evidence was "direct evidence of the crime charged in the challenged criminal case, therefore, the fact that the evidence also constituted a separate and distinct crime was of no moment).

Since the undersigned has determined that no error occurred in the admission of this evidence, Texada has no basis for any alleged due process violation. *Robinson v. Whitley,* 2 F.3d 562, 566-67 (5th Cir. 1993) *citing Banks v. McGougan*, 717 F.2d 186, 190 (5th Cir.1983); *Muhammed*, 2007 WL 3104331 at *10 .[46]

---

[46]To the extent that Texada requests that this court determine the constitutionality of the statute, that claim cannot be considered. The Third Circuit declined to reach the merits of the claim on the basis of a state procedural rule, Rule 2-12.4 of the Uniform Rules of the Courts of Appeal, which is an adequate and independent basis for its ruling. *Id*. at 485. Accordingly, the claim is procedurally defaulted. The procedural default doctrine applies to bar federal *habeas corpus* review when a state court declines to address a prisoner's federal claims because the prisoner failed to follow a state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). Accordingly, since Texada has not demonstrated cause and prejudice for the default or that a miscarriage of justice will result from the denial of federal *habeas* review, this court should refuse to review the merits of this claim as well. *See Finley*, 243 F.3d 215, 220-221 (5th Cir. 2001); *Coleman, supra; McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Moore v. Roberts*, 83 F.3d 699 (5th Cir.1996); *Gray v. Netherland*, 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Sones*, 61 F.3d at 416. *Murray*, 477 U.S. at 496, 106 S.Ct. at 2649; *Glover*, 128 F.3d at 904; *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir.1995); *Callins v. Johnson*, 89

### C.  Comment of ADA Tromblay

The third request for a mistrial occurred when, during direct-examination, defense counsel asked his witness, ADA Gary Tromblay, why, after obtaining a conviction for negligent homicide, he filed a felon-in-possession charge against gang member and witness Tyrone Johnson, attempting to show that the State filed the charge to penalize Johnson for his favorable testimony for the defense.

Initially, Tromblay responded to this line of questioning stating that "he [Johnson] committed perjury and that his testimony was not accurate and we also found out that the shooting was anything but accidental."[47]

Tromblay further testified that "[a]t his trial . . . he [Johnson] specifically denied ever being convicted of any crime.  However, his testimony yesterday was in 1994 he was convicted of aggravated robbery in Texas and that was something that he specifically denied committing whenever he was tried . . . ."  Thus, because he had been convicted of aggravated robbery and he admitted possessing a firearm, "that is a crime called convicted felon in possession of a firearm and that is an additional crime."[48]  Tromblay further explained that another reason he filed the charge was because he "read a copy of that letter the jury saw yesterday and that troubled me . . . that a person who is

---

F.3d 210, 213 (5th Cir.1996) *quoting McClesky*, 499 U.S. at 495, 114 S.Ct. at 1471.

[47]tr. pg. 2424.

[48]tr. pg. 2425.

incarcerated, instead of trying to rehabilitate himself, decides that he wants to be a bigger and badder gangster when he gets out. And also we have reason to believe that the shooting was anything but an accident."[49]  Despite Tromblay's explanation, defense counsel persisted and again asked why Tromblay filed the charge, to which Tromblay ultimately responded:

> I filed it, Mr. Barstow, for three chief reasons: Number one, he lied at his trial that he had ever been convicted of any felony. As we found out in Texas he was convicted for the crime of aggravated robbery which is akin to armed robbery in Louisiana. Secondly, I've also found out through the police that this shooting was anything but an accident and that in fact he shot Mr. Miquel Keys who was the victim in this case at the direction of this defendant, Martin Texada, because he wasn't following orders, Mr. Barstow.[50]

Defense counsel objected to this testimony.  Although defense counsel's request for a mistrial was denied, the trial court nevertheless instructed the jury to disregard Tromblay's last comment. The court further advised defense counsel to be careful about the questions he asked.[51]

On direct appeal, relying on prior state precedent, the Third Circuit found that the State should not be penalized for testimony which the defense elicited, that the testimony was not elaborative and that the trial court admonished the jury and therefore there was "no indication that the trial court abused its discretion in denying the mistrial motion." *Id.* at 488.

---

[49]tr. pg. 2426.

[50]tr. pg. 2427.

[51]tr. pg. 2427.

The undersigned agrees that in this case, petitioner has not established that the denial of his motion for a mistrial constituted to an abuse of discretion.  Moreover, considering that the complained of testimony was elicited by defense counsel on direct examination of his witness, and further considering the trial court's admonition that the jury disregard the comment, petitioner has not established that the denial of the motion rendered petitioner's trial fundamentally unfair so as to violate petitioner's due process rights.

Although this testimony may have been damaging to the defense, defense counsel elicited this testimony by repeatedly asking Tromblay, on direct examination, to explain the circumstances surrounding the filing of the additional charge against Johnson and his reasons therefore.  Tromblay had already given his reasons, but defense counsel persisted with this line of questioning.  Tromblay's response to defense counsel's repeated and persistent questioning was both a relevant and pertinent explanation made necessary by the questions posed by defense counsel.  Indeed, under similar circumstances, the Fifth Circuit has affirmed the trial court's refusal to grant a mistrial when the challenged prejudicial "other crimes evidence" was elicited by defense counsel.  *United States v. Merida*, 765 F.2d 1205, 1220-1221 (5th Cir. 1985) *citing United States v.Witt*, 618 F.2d 283 (5th Cir.), *cert. denied,* 449 U.S. 882, 101 S.Ct. 234, 66 L.Ed.2d 107 (1980); *United States v. Ramirez*, 145 F.3d 345, 354 (5th Cir. 1998); *see also United States v. Gilbert-*

*Bey*, 12 F.3d 208 (5th Cir. 1993) (unpublished).[52]

Finally, in light of the overwhelming evidence of petitioner's guilt, discussed in detail above, the undersigned is unable to say that petitioner has demonstrated that there was a reasonable probability that absent Tromblay's singular, solicited and responsive remark, followed by an objection and curative admonition, the jury would have reached a different verdict. *See also Greer,* 483 U.S. at 766-767 (finding that a prosecutor's single improper question followed by an objection and a curative instruction did not deny the defendant due process given the sufficiency of properly admitted evidence proving the defendant's guilt). Therefore this claim has no merit.

### D.  Gang Hierarchy Exhibit

Petitioner complains that the trial court erred in denying his request for a mistrial as a result of the State's use of a demonstrative aid, a chart displaying the 5/9 Bloods hierarchy with Texada's name at the top.  The record establishes that the prosecutor did not enter the chart into evidence, but rather, the display was ordered into evidence by the trial court for the limited purpose of the mistrial motion.[53] The Motion for mistrial was made on the third day of trial after testimony that the gang was led by Texada.[54]

---

[52]Likewise, the Louisiana Supreme Court has found that the State cannot be charged with testimony elicited by defense counsel implying that the defendant had committed other crimes, and accordingly, such testimony may not be the basis for the grant of a mistrial.  *State v. Tribbet*, 415 So.2d 182, 184-185 (La. 1982) *citing State v. Kimble*, 375 So.2d 924, 928-929 (La.1979).  The Louisiana Supreme Court has also found no merit to a defendant's claim of trial court error in the admission of "other crimes evidence" which was introduced by the defense through the defendant's own testimony.  *State v. Edwards*, 420 So.2d 663, 674 (La. 1982).

[53]tr. pg. 2143.

[54] tr. pg. Harrison 1883-1885; Trahan 1993.

Nevertheless, defense counsel objected to the display because it had been in view of the jury since the beginning of the trial, because it was highly prejudicial and because, in defense counsel's view, there had been "absolutely no proof" that Texada was head of the 5/9 Bloods gang.[55]  In response to the Motion, the trial court had the display removed from the jury's view, and denied the Motion.[56]

In light of evidence presented at trial, the undersigned concludes that the chart's display to the jury was not so fundamentally unfair that it rises to the level of a due process violation.  The record establishes that prior to the Motion, both Officers Harrison and Trahan had testified that they had determined that Texada led the gang.  Moreover, after denial of the Motion, there was additional testimony from gang members Freeman, Henry and Pitre that Texada was, in fact, the leader of the 5/9 Bloods gang.[57]  Thus, the prejudicial effect of the chart, if any, was minimal and clearly was not a crucial, highly significant factor in Texada's conviction.  In sum, there is no reasonable probability that the verdict might have been different had the jury not viewed the chart. This claim is therefore without merit.

### E.  Cumulative Effect

Finally, Texada contends that the cumulative effect of all of the above alleged errors in failing to grant a mistrial denied him due process, meriting federal *habeas* relief.

---

[55]tr. pg. 2141-2142.

[56]tr. pg. 2143.

[57] tr. pg. Freeman 2145-2146; Henry 2245-2247; Pitre 2376, 2379, 2381.

The Fifth Circuit has recognized the "cumulative error doctrine" which provides that "an aggregation of non-reversible errors (that is, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial." *United States v. Williams*, 264 F.3d 561, 572 (5th Cir. 2001) *citing United States v. Munoz,* 150 F.3d 401, 418 (5th Cir.1998).

However, in light of the above analysis, Texada has failed to establish *any* error of constitutional significance in the conduct of his state trial.  Petitioner's trial was by no means fundamentally unfair.  Therefore, relief is not available under the cumulative error doctrine.  *See Williams,* 264 F.3d at 572 (no cumulative error where defendant failed to identify single error in jury selection);  *Miller v. Johnson,* 200 F.3d 274, 286 fn. 6 (5th Cir. 2000) (petitioner who failed to demonstrate any error by trial counsel could not establish cumulative error); *Beall v. Cockrell*, 174 F. Supp.2d 512, 525 (N.D. Tex. 2001) (federal *habeas* relief unwarranted when petitioner failed to demonstrate any error in his state trial); *Badeaux v. LeBlanc,* 2005 WL 3501423, *14 (W.D. La. 2005) (same); *Brigham v. Cockrell*, 2002 WL 1776933, *5 (N.D. Tex. 2002) (same); *Campbell v. Dretke*, 2005 WL 2372047, *19 (S.D. Tex. 2005) (same).

For the reasons set forth above;

**IT IS RECOMMENDED** that petitioner's remaining claims that there was insufficient evidence to support his convictions, that his sentence was excessive and that the state court improperly denied a mistrial based on erroneous admission of "other

crimes" evidence (claims 1through 3 herein)  be **DENIED** and **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A  party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See, Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.  1996).**

**THUS DONE AND SIGNED** in Chambers at Lafayette, Louisiana, this 27th  day of May, 2010.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE